UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:07-cv-283- RLY-WGH |
| | ) | |
| VERNON HUGH BOWMAN, | ) | |
| Defendant. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This patent infringement case is before the court on Monsanto Company's

("Monsanto") Motion for Summary Judgment.  The court identified the legal issue in

dispute and set forth the factual background in this court's Order of June 11, 2009

(Docket #93), wherein the parties were asked to supplement the record and provide

additional briefing to assist the court in determining the applicability of the doctrine of

patent exhaustion to the circumstances of this case.  The additional briefing has, indeed,

assisted the court in its analysis of the legal issues and furthered its understanding of

some of the terminology pertinent to some agronomic/agricultural processes which are

relevant to this case.  For the sake of efficiency, the court incorporates by reference the

entire factual background as set forth in its June 11, 2009 Order and will limit its effort to

recite the facts here to a brief summary of events sufficient to set the table for a resolution

of the key legal issue, the applicability of the doctrine of patent exhaustion.

Defendant, Vernon Bowman ("Bowman"), admits that in the past he purchased commodity soybean seeds[1] from a grain elevator for the purpose of planting and harvesting a second season crop. He also admits that the majority of the commodity soybeans he purchased contained, by happenstance or otherwise, the "Roundup Ready®" trait patented by Monsanto. Roundup Ready® soybeans are genetically modified soy beans. The genetic modification was developed and patented by Monsanto and carries forward into each successive crop of soybeans. Monsanto restricts the sale of seeds containing its patented trait to those farmers who agree to be licensed to a single use of the seed or its progeny for planting. However, the soybeans produced from a licensed crop are then often sold by the farmer to a grain elevator, which may or may not segregate the soybeans as "carriers" of the patented trait. The license under which a farmer is authorized to produce this single crop does not restrict his sale of that crop to a grain elevator, but does state that the farmer agrees "not to save any crop produced from this

---

[1]The soybean plant is a legume. The fruit of a soy bean plant are the pods, which contain two to four seeds that are rich in proteins. It is common for these seeds to be referred to as beans. In 1995, Monsanto introduced the genetically modified Roundup Ready® soybeans, which are resistant to Roundup, a commonly applied herbicide manufactured by Monsanto. In 1997, approximately 8% of soybeans cultivated for the commercial market in the United States were genetically modified. By the year 2006, that figure was 89%. *See* Wikipedia.org/wiki/Soy_bean.

In the United States, after harvest, the beans/seeds are often sold to grain elevators/dealers. Bowman refers to the beans/seeds as "grain" when they are purchased from a grain dealer. Such a reference to beans/seeds held by a grain dealer as grain, may well be a common reference in agricultural vernacular; however, regardless of which of these terms is used by the court to describe the useful protein product from the soybean plant, it intends no distinction unless specifically explained.

seed for replanting, or supply saved seed to anyone for replanting."

After harvesting the crop he produced from the commodity soybeans, Bowman saved some of the crop for use in the next year's second season planting and, supplemented by additional purchases of commodity soybeans (the majority of which also contained the Roundup Ready® trait), continued that process annually until this lawsuit was filed by Monsanto in an effort to stop this practice by Bowman. Bowman has also planted his first season crops with Roundup Ready® soybeans pursuant to a license, but claims he has never saved seed from such a planting. Monsanto claims that Bowman has infringed on its patent through the unauthorized planting of the commodity soybeans which contain the Roundup Ready® trait and via each successive crop planted with saved seed and commodity soybeans.

In defense, Bowman claims that when the soybeans from a licensed Roundup Ready® crop are harvested and sold to a grain elevator or dealer, they are sold without restriction, mixed with all other soybean crops in from the area and, therefore, when purchased and used by farmers to plant as seed (commodity soybeans) for another crop, they are not protected by patent. Bowman has primarily argued that the doctrine of patent exhaustion applies to strip such commodity soybeans from any patent restrictions, but in this latest round of briefing he has also questioned the constitutionality of Monsanto being allowed to claim a patent violation against anyone planting a soybean/seed with the

Roundup Ready® trait, regardless of how that bean/seed came into their possession. In fact, Bowman has invited the court to go so far as to find that by granting Monsanto a utility patent for its alteration of a seed producing plant, the United States Patent and Trademark Office has acted in violation of the Constitution. Unfortunately for Bowman, aside from the broad statement that such patent protection unduly infringes the rights of farmers and is unconstitutional, he has not developed a cogent argument with respect to the specific constitutional rights he contends have been violated.

Nevertheless, what is compelling about Bowman's argument, and the reason why the court sought further briefing, is the effect, intended or unintended by Monsanto, that Monsanto's claim to patent protection for all soybeans that carry the Roundup Ready® trait has had on the ability of farmers to use commodity beans/seed to plant in lieu of buying beans/seed from Monsanto or another seed producer. As Bowman points out, Monsanto's domination of the soybean seed market, combined with the regeneration of the Roundup Ready® trait and the lack of any restriction against the mixing of soybeans harvested from a Roundup Ready® crop from those that are harvested from a crop that was not grown from Roundup Ready® seed, has resulted in the commodity soybeans sold by grain dealers necessarily carrying the patented trait, thereby eliminating commodity soybeans as a low cost (but higher risk) source for planting.

Monsanto, on the other hand, has a compelling argument of its own. It has

expended great effort and much money to develop a type of soybean which can be grown efficiently without weed problems, because the planted crop can be treated with a herbicide containing glyphosate. While this type of genetic modification to the soybean plant may be controversial in other parts of the world, its widespread use in the United States indicates that it has been readily accepted here. Unless Monsanto receives the patent protection it is trying to enforce in this case, because the trait carries forward to each successive crop, there would be nothing stopping all farmers from buying commodity soybeans for planting from this point forward, thereby allowing such farmers to receive the benefit of the Roundup Ready® genetic modification without compensating Monsanto for its research and development work. In essence, Monsanto's argument is that the glyphosate resistant trait is a technology that Monsanto owns and licenses. Although the beans produced as a result of planting Roundup Ready® seeds belong to the farmer, the technology contained in the progeny still belongs to Monsanto and, without authorization, may not be duplicated through a planting of that progeny. In short, the progeny soybeans can be sold for any use *other than planting*, regardless of who is in possession.

As a counterpoint to Monsanto's own equitable assertion stands Bowman's contention that Monsanto could use its "Terminator gene" to assure that the progeny of Roundup Ready® seeds do not contain the trait and thereby protect its interest in selling additional soybean seed. However, there is no admissible evidence in the record with

regard to the existence of such a gene or its application in these circumstances. More importantly, the court is not the appropriate venue for raising a policy argument with respect to conditions which should be placed upon an award of a utility patent for genetically altered seed.

Another policy argument raised by Bowman is that Monsanto should be required to include with its license to plant Roundup Ready® seed, a requirement that the resulting crop be segregated from non-Roundup Ready® crops going forward, so that commodity soybean planting is not eliminated as an option for farmers. This later argument dovetails with Bowman's claim that the doctrine of patent exhaustion applies in this case because of the lack of a soybean crop segregation or similar restriction.[2]

In the end, despite Bowman's compelling policy arguments addressing the monopolizing effect of the introduction of patented genetic modifications to seed producing plants on an entire crop species, he has not overcome the patent law precedent which breaks in favor of Monsanto with regard to its right to patent protection against the use of the progeny of its patented Roundup Ready® seeds. Said another way, the court may disagree with the decision to award unconditional patent protection to Monsanto for its genetically altered soybeans and their progeny, but this court does not make policy;

---

[2]In a policy related argument, Bowman also spends time in his supplemental submission opining as to whether Roundup Ready® soybeans are actually soybeans or, rather, a new variety of plant, which should be sold or traded within it own separate categorization. Resolution of such an issue is beyond the realm of this court.

rather, it interprets and enforces the law, which, in this case, does not support Bowman.

The essence of Bowman's argument with regard to patent exhaustion is that the relatively recent Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S.__, 128 S.Ct. 2109 (2008) lends support to his contention that when a duly licensed farmer sells his crop of soybeans produced from Roundup Ready® seeds, it is an authorized unconditional sale of the patented technology and, therefore, the patent is exhausted as to those soybeans. This court is not the first to hear a farmer rely on *Quanta* as a basis for finding that the sale of Roundup Ready® seed, unaccompanied by any restriction on its further use, exhausts Monsanto's patent.

In *Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed. Cir. 2006), the Federal Circuit ruled that the patent exhaustion doctrine did not apply to a farmer who had purchased Roundup Ready® seed for planting from an authorized distributor and saved seed from the progeny for purposes of successive year planting. The farming group involved had purchased Roundup Ready® seed from a Monsanto authorized distributor without signing or agreeing to any accompanying license or restriction. They argued that without a licensing restriction, their use of those seeds or the progeny was unencumbered. *Id*. at 1335-36. The Federal Circuit, however, was not persuaded.

> Scruggs argues that it purchased the Monsanto seeds in an unrestricted sale, and that it was therefore entitled to use those seeds in an unencumbered fashion under the doctrine of patent exhaustion. The first sale/patent exhaustion doctrine establishes that the unrestricted first sale by a patentee

of his patented article exhausts his patent rights in the article. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 701 (Fed.Cir. 1992); *see also LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed.Cir. 2006). The doctrine of patent exhaustion is inapplicable in this case. There was no unrestricted sale because the use of the seeds by seed growers was conditioned on obtaining a license from Monsanto. Furthermore, the "'first sale' doctrine of exhaustion of the patent right is not implicated, as the new seeds grown from the original batch had never been sold." *See Monsanto v. McFarling*, 302 F.3d 1291, 1299 (Fed.Cir. 2002). Without the actual sale of the second generation seed to Scruggs, there can be no patent exhaustion. The fact that a patented technology can replicate itself does not give a purchaser the right to use replicated copies of the technology. Applying the first sale doctrine to subsequent generations of self-replicating technology would eviscerate the rights of the patent holder.

*Id.*

After the Supreme Court denied certiorari, *Scruggs v. Monsanto Co.*, 549 U.S. 1342 (2007), the case went back to the district court for further proceedings. While the *Scruggs* case was still with the district court, the Supreme Court rendered its decision in *Quanta.* Citing *Quanta* as support, Scruggs sought to revitalize its exhaustion defense to Monsanto's claim of patent infringement. The district court rejected that effort and, on Petition for Permission to Appeal pursuant to 28 U.S.C. § 1292(b), the Federal Circuit recently denied an interlocutory appeal of that decision. 2009 WL 1228318 (May 4, 2009 Fed. Cir.).

Bowman argues that unlike *Scruggs*, where the farmer saved seed from the first crop grown from the Roundup Ready® seeds purchased from an authorized distributor, Bowman did not save seed from his first season crops (which were grown from first

generation Roundup Ready® seeds purchased by Bowman from a licensed distributor,

Pioneer).  Rather, he planted progeny soybeans contained in commodity soybeans which

had been sold to grain dealers without restriction.  While this may appear at first blush to

be a distinction that makes a difference, it does not under established patent law.  Even

before the *Scruggs* litigation, the Federal Circuit stated, in a case with a similar challenge

to Monsanto's patent protection against replanting saved seeds, that:

> [t]he "first sale" doctrine of exhaustion of the patent right is not implicated,
> as the new seeds grown from the original batch had never been sold.  The
> price paid by the purchaser "reflects only the value of the 'use' rights
> conferred by the patentee." *B. Braun Medical Inc. v. Abbott Labs.*, 124 F.3d
> 1419, 1426, 43 USPQ2d 1896, 1901 (Fed.Cir.1997). The original sale of the
> seeds did not confer a license to construct new seeds, and since the new
> seeds were not sold by the patentee they entailed no principle of patent
> exhaustion.

*Monsanto Co. v. McFarling*, 302 F.3d 1291, 1299 (Fed. Cir. 2002).  The fact that

Monsanto had not sold the progeny seeds was relied on by the Federal Circuit to eliminate

a defense based upon patent exhaustion.

Another reason why the *McFarling* case is persuasive in these circumstances is the

Federal Circuit's rejection of the farmer's reliance on *United States v. Univis Lens Co.,*

316 U.S. 241 (1942) as support for the application of the doctrine of patent exhaustion.

As we detailed in our Order of June 11, 2009, the Supreme Court turned to its analysis in

the *Univis* decision to assist it in reaching its conclusion in the *Quanta* case.

*Quanta* involved the application of the doctrine of patent exhaustion to a method

patent where the item which embodied the method was sold with implied authorization from the patent holder. *Quanta,* 128 S.Ct. at 2110-11. *Univis* involved patented eyeglass lens blanks, which the patentee had sold to lens makers, but still sought to control the resale price. *Univis*, 316 U.S. at 247-48. In both cases, the patent exhaustion doctrine was found to apply because the patent holder had licensed the article at issue to another entity without sufficient conditions to protect its patent rights. The distinction found by the Federal Circuit in *McFarling,* and which exists here as well, is that the Monsanto licenses (and the agreements its licensees required from farmers) for Roundup Ready® soybeans specifically excluded saving seed or otherwise providing anyone progeny soybeans for purposes of planting. *McFarling,* 459 F.3d at 1335-36. No unconditional sale of the Roundup Ready® trait occurred because the farmers could not convey to the grain dealers what they did not possess themselves. *Id.* at 1336. It is no different in the case at bar. The grain elevator/dealer from whom Bowman bought the soybeans had no right to plant the soybeans and could not confer such a right on Bowman. Consequently, Bowman has infringed on Monsanto's patent rights by planting the commodity soybeans, which contained the patented trait, and then applying a glyphosate-based herbicide to that planted crop.

That brings the court to the question of damages. In its motion, Monsanto seeks compensatory damages, enhanced damages, attorney fees and interest, as well as a permanent injunction enjoining Bowman from using or selling its patented crop

technologies.  However, this is neither an exceptional nor an egregious case; therefore, the court will not award enhanced damages, attorneys fees or prejudgment interest. Bowman never attempted to hide what he was doing and, in good faith, he believed that his actions did not violate the patents at issue.  As difficult as it has proven for the court to discount a very compelling argument on the exhaustion of Monsanto's patent rights, it was certainly within reason for Bowman to reach a conclusion that what he was doing was within legal bounds.

What remains then is for the court to determine the compensatory damages and the availability of permanent injunctive relief.  Monsanto is entitled to a reasonable royalty for the unlicensed use of its technology.  35 U.S.C. § 284.  Monsanto has provided an expert assessment of, and testimony with respect to, an amount of damages it is entitled to receive for the second season crops planted by Bowman for which he used, without license, soybeans which carried the Roundup Ready® trait from 2002 through 2006. Monsanto has offered evidence that the analysis used by their experts to calculate a reasonable royalty is accepted by their peers in the industry and an examination by the court has discovered no basis to question the methodology used.  More importantly, Bowman has not contested the method of damage calculation or offered an alternative measure.  The expert report submitted by Monsanto calculates the upper bounds of an estimated royalty for the applicable years to be $30,873.80.  The report goes on to suggest that because Monsanto faces constant risk of unauthorized use and must engage in such

activities as crop monitoring in order to enforce its patents, the costs of such compliance monitoring and other risk related costs should be added to the $30,873.80 figure. Under the circumstances of this case, the court does not find that any additional amount should be added to the statutorily mandated reasonable royalty, which was appropriately calculated on a hypothetical basis by Monsanto's experts.

Finally, there is the issue of injunctive relief to which Monsanto is entitled. As a part of the final judgment that shall issue separately, the court will enjoin Defendant, Vernon Hugh Bowman, permanently, from making, using, selling or offering to sell any of Monsanto's patented crop technologies.

## CONCLUSION

Based upon the facts and analysis contained in the court's prior Order of June 11, 2009 (Docket #93) and the explication contained within this entry, Monsanto's Motion for Summary Judgment (Docket #62) is **GRANTED** and judgment shall be entered in favor of Monsanto and against Vernon Hugh Bowman in the amount of $30,873.80, plus costs and interest from the date of judgment.

**SO ORDERED** this 30th day of September 2009.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Daniel C. Cox
THOMPSON COBURN, LLP
dcox@thompsoncoburn.com

David B. Jinkins
THOMPSON COBURN, LLP
djinkins@thompsoncoburn.com

Raymond L. Massey
THOMPSON COBURN LLP
rmassey@thompsoncoburn.com

Jeffrey A. Masson
THOMPSON COBURN LLP
St. Louis, MO 63101-1611

Peter J. Sacopulos
SACOPULOS JOHNSON & SACOPULOS
pete_sacopulos@sacopulos.com

Copy to:

VERNON HUGH BOWMAN
21488 East State Road 58
Sandborn, IN 47578